UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-23904-UU

UNITED STATES OF AMERICA, *ex rel.*,
NALISA SIMONA SAATI,

      Plaintiffs,

vs.

CREDICO (USA), LLC,

      Defendant.
_____/

## FIRST AMENDED COMPLAINT

COMES NOW, the Plaintiff, NALISA SIMONA SAATI (hereinafter "Relator"), on behalf of THE UNITED STATES OF AMERICA, *ex rel.,* by and through undersigned counsel, who files this Complaint against Defendant, CREDICO (USA), LLC ("Defendant"), and states as follows:

## PRELIMINARY STATEMENT

1.     Relator brings this complaint on behalf of The United States of America, *ex rel.,* seeking damages and penalties against Credico (USA), LLC. and other affiliated telecommunications companies under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. (the "FCA"), and, in the alternative, under the common law for unjust enrichment and payment under mistake of fact.

2.     Relator asserts claims seeking damages and penalties against Credico (USA), LLC. ("Credico") and other affiliated telecommunications and direct marketing companies under the

False Claims Act, 31 U.S.C. §§ 3729 et seq. (the "FCA"), and, in the alternative, under the common law for unjust enrichment and payment under mistake of fact.

3.    During the relevant time period, Credico through numerous other corporate entities engaged in a scheme to knowingly submit false claims for federal payments by seeking reimbursement pursuant to the Lifeline program for individuals who did not meet Lifeline eligibility requirements and to submit false certifications along with monthly remittance requests.

4.    Lifeline is a federal program that offers subsidies to companies that provide discounted landline and mobile phone services to eligible low-income consumers.

5.    Relator worked for Credico and various of its affiliates in late 2017 into early 2018; though, on information and belief, the illegal practices stated herein had been occurring for many years and continue to occur as of the present date.

6.    Credico, through its various affiliated consumer marketing companies, and on behalf several national Eligible Telecommunications Carriers ("ETCs"), enrolled tens of thousands of ineligible consumers in the Lifeline program in numerous states.

7.    As a result, Credico and its partners submitted or caused to be submitted grossly inflated claims for reimbursement and received millions of dollars in federal payments to which they were not entitled.

8.    These entities also submitted monthly remittance requests that falsely certified compliance with Lifeline program rules, which, among other things, require the implementation of policies and procedures for ensuring the eligibility of Lifeline subscribers and prohibit a household from receiving more than one Lifeline phone ("one-benefit-per-household requirement").

9.      The entities were well aware that they were not effectively screening the eligibility of prospective subscribers and that Credico sales agents were engaging in widespread fraudulent enrollment practices, including repeatedly using the same eligibility proof (e.g., Supplemental Nutrition Assistance Program or "SNAP" card) to enroll multiple consumers or slightly altering the way consumer information was input so that duplicate subscribers would not be detected.

10.     Managers were notified of clearly fraudulent conduct by specific sales agents, but still allowed them to continue to enroll subscribers for whom Credico received federal payments.

11.     Defendants' senior managers knew that Credico did not have adequate controls in place to comply with Lifeline requirements. Furthermore, Credico and its partners failed to allocate sufficient resources and personnel to reviewing the eligibility of prospective subscribers and ensuring that subscribers met Lifeline program criteria. Instead, operating with deliberate disregard to Lifeline rules, the companies focused on enrolling as many consumers as possible within a short timeframe in order to meet the aggressive sales targets established by Credico.

12.     By failing to implement meaningful and effective procedures and systems for preventing the enrollment of duplicate or otherwise ineligible Lifeline subscribers, seeking and receiving federal reimbursement for ineligible subscribers, and submitting false certifications, Credico, with the knowledge and involvement of the other entities, violated the FCA and the common law.

## PARTIES

13. This is an action to recover damages and civil penalties for multiple false claims for payment made by the Defendant, acting individually and jointly, to the United States Government or to an agent of the armed forces brought under the Federal False Claims Act ("FCA"), 31 U.S.C

3729 *et seq.* for work performed at Ft. Campbell Military Base located in Tennessee and Kentucky.

14. NALISA SIMONA SAATI ("Relator") brings this action on behalf of the United States Government. NALISA SIMONA SAATIi is a resident of Florida, and her current address is 3200 Mery Street, Apartment 2, Miami, Fl. 33133.

15. Defendant is a for-profit Florida Profit Corporation and is authorized to conduct and has conducted business in the state of Florida at times material hereto.

16. Whenever the term "Defendant" is used, it shall be deemed to mean the Defendant acting jointly, either directly or indirectly and as contemplated by the provisions of the Davis-Bacon Act.

17. Whenever the terms misrepresentation, representation, act, transaction of any of the Defendant in this Complaint, it shall be deemed to mean that any of the Officers, Directors, Agents, Managers, Employees, while actively engaged in the course and scope of their employment did or authorized such actions on behalf of Defendant.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over the Government's FCA claims pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the Government's common law claims pursuant to 28 U.S.C. § 1345.

19. This Court may exercise personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) as well as 28 U.S.C. § 1391(b) because CREDITO (USA), et al resides and transacts business in this District and some of the acts giving rise to the claims occurred in this District.

## BACKGROUND AND FACTUAL ALLEGATIONS

### I.    The Lifeline Program

20.    Lifeline is a federal government program that was established to support the provision of discounted landline and mobile phone services to eligible low-income consumers so that they are able to connect to jobs, family members, and emergency services. To be eligible for the program, a consumer must have income that is at or below 135% of the Federal Poverty Guidelines or participate in one of a number of specified federal, state, or Tribal assistance programs, including but not limited to Medicaid, Supplemental Nutrition Assistance Program (i.e., Food Stamp Program), Supplemental Security Income (SSI), or Federal Public Housing Assistance (Section 8). 47 C.F.R. § 54.409(a).

21.    ETCs, such as those that worked with Credico, receive $9.25 per month for each qualifying low income consumer who receives the discounted service, and up to an additional $25.00 per month for each such consumer who resides on Tribal lands. 47 C.F.R. § 54.403(a).

22.    To receive reimbursements for discounts offered pursuant to the Lifeline program an ETC must comply with the Lifeline rules and regulations established by the FCC. 47 C.F.R. §§ 54.400-54.422. Payments are provided to an ETC "based on the number of actual qualifying low-income consumers it serves[.]" 47 C.F.R. § 54.407(a).

23.    An ETC is not permitted to receive payments for subscribers who are not eligible for the Lifeline program, and may not seek reimbursement for providing Lifeline service to a consumer unless the ETC has confirmed the consumer's eligibility. 47 C.F.R. § 54.410(a)-(d).

24.    Lifeline discounts are limited to one service per household. 47 C.F.R. § 54.409(c). A "household" is "any individual or group of individuals who are living together at the same address as one economic unit." 47 C.F.R. § 54.400(h).

25.    An "economic unit" includes "all adult individuals contributing to and sharing in the income and expenses of a household." Id. A consumer whose household receives no other Lifeline discount and who meets either the above-stated income requirement or is enrolled in an eligible assistance program is deemed a "qualifying low-income consumer." 47 C.F.R. § 54.400(a).

26.    An ETC must obtain a certification of eligibility from prospective subscribers that verifies, among other things, that the consumer meets the income-based or program-based eligibility criteria for receiving Lifeline service and that the consumer's household is not already receiving a Lifeline service. 47 C.F.R. § 54.410(b)-(d).

27.    ETCs are required to "implement policies and procedures for ensuring that their Lifeline subscribers are eligible to receive Lifeline services." 47 C.P.R. § 54.410(a). This includes confirming that the consumer is not a duplicate subscriber.

28.    At a minimum, the ETC must search its own internal records to ensure that it is not already providing Lifeline services to the same consumer or another individual residing at the same address who has not specifically certified that he or she is part of an independent household.

29.    Except in states that have developed their own systems for preventing duplicate enrollments, ETCs also are required to query the National Lifeline Accountability Database ("NLAD"), which was introduced in early 2014, to determine whether a prospective subscriber, or anyone living at the prospective subscriber's address, is already receiving Lifeline service from another ETC. 47 C.P.R. § 54.404(b).

30.     USAC administers the NLAD. ETCs are required to re-certify the eligibility of all Lifeline subscribers on an annual basis except where a state Lifeline administrator or other state agency is responsible for such recertification. 47 C.P.R. § 54.410(f). This may be done by querying appropriate eligibility databases, or by obtaining a signed eligibility recertification from the subscriber. 47 C.F.R § 54.410(f).

## II.     Lifeline Certifications and Remittance Requests

31.     ETCs file with USAC a FCC Form 497 ("497 Form") for each Study Area Code ("SAC") to request reimbursement for Lifeline services provided during the course of a calendar month.

32.     The 497 Form lists the total number of qualifying low-income Lifeline subscribers who received a Lifeline discount from the ETC and the total reimbursement that the ETC claimed for the month.

33.     Federal regulations state that an ETC may receive reimbursement only if it certifies as part of its reimbursement request that it is in compliance with all of the Lifeline rules and that it has obtained valid certification and recertification forms for each subscriber for whom the ETC seeks reimbursement. 47 C.F.R. § 54.407(d). Specifically, the 497 Form certification signed by the ETC's officer states, in pertinent part:

I certify that my company is in compliance with all of the Lifeline program rules, and, to the extent required, have obtained valid certifications for each subscriber for whom my company seeks reimbursement. Based on the information known to me or provided to me by employees responsible for the preparation of the data being submitted, I certify under penalty of perjury that the data contained in this form has been examined and reviewed and is true, accurate, and complete.

34.     ETCs also are required to file a FCC Form 555 ("555 Form") annually with USAC for each SAC where they provide Lifeline services. The 555 Form reflects the results of an ETC's annual recertification efforts, including the number of subscribers de-enrolled as a result of the re-certification process and non-usage of phones. 47 C.F.R. § 54.416(b).

35.     As part of the submission of annual recertification data, federal regulations require each ETC to again certify that it has policies and procedures in place to ensure. that its subscribers are eligible to receive Lifeline services and that the ETC is in compliance with all Lifeline certification procedures. 47 C.F.R. § 54.416(a). Specifically, the 555 Form certification signed by the ETC's officer states, in pertinent part:

I certify that the company listed above has certification procedures in place to:

A) Review income and program-based eligibility documentation prior to enrolling a consumer in the Lifeline program, and that, to the best of my knowledge, the company was presented with documentation of each consumer's household income and/or program-based eligibility prior to his or her enrollment in Lifeline; and/or

B) Confirm consumer eligibility by relying upon access to a state database and/or notice of eligibility from the state Lifeline administrator prior to enrolling a consumer in the Lifeline program.

36.     The officer also must state that he or she certifies that the company "is in compliance with all federal Lifeline certification procedures."

**III.     Credico's Aggressive Growth Strategy**

37.     Credico relied primarily on in-person sales events to enroll consumers in the Lifeline program. Credico solicited and enrolled consumers by contracting with several distributors based

throughout the country, referred to as "master agents," who in turn hired individual "field agents" to engage in face-to-face marketing at public events and spaces.

38.     The field agents were responsible for collecting the consumer's information and performing individual enrollments. Credico paid the master agents based in part on the number of subscribers successfully enrolled, and the master agents in turn paid commissions to their field agents. Credico set aggressive sales targets for its master agents, and pressured them to meet these goals.

39.     Credico would often establish multiple master agents in a single city or geographic area under different company names even though the teams would work out of the same office. For example, the office where Relator worked out of in Miami, FL housed agents under three different company names: Smith Advertising (owned by Timothy Smith), The Plato Group (owned by Steve Dongo), and SMC Executives (owned by Matthew Cooke). Relators name badge stated she worked for SMC Executives. Credico also referred to its higher performing offices as "highrollers".

40.     Additionally, it is also worth noting that Credico and its "master agent" entities skirted federal tax and employment laws by misclassifying its field agents as independent contractors for whom Credico paid no taxes and provided no benefits. Also, as result of this misclassification, field agents were consistently not compensated proper minimum and overtime wages as required by both state and federal wage laws.

### IV.   Credico Regularly Sought and Benefitted from Federal Payments for Duplicate Subscribers and Subscribers Who Otherwise Did Not Meet the Eligibility Requirements of the Lifeline Program

41.     Credico, with the knowledge and involvement of ETCs such as Assurance Wireless, Xfinity, and AT&T, engaged in a widespread practice of seeking federal reimbursement for

consumers who did not meet Lifeline eligibility requirements, including tens of thousands of duplicate subscribers, in violation of Lifeline rules and regulations.

42.     These companies failed to implement effective policies, procedures, and systems to identify duplicate or otherwise ineligible subscribers. As a result, Credico and the ETCs submitted 497 Forms that included grossly inflated claims for reimbursement and received millions of dollars in federal payments to which they were not entitled.

43.     For much of the relevant time period, Credico turned a blind eye to the wide range of fraudulent enrollment practices employed by its field agents and ineligible consumers.

44.     For example, Credico field agents repeatedly used the same benefit program eligibility proof to fraudulently enroll multiple ineligible consumers. Field agents collected and maintained stacks of improperly obtained cards for this purpose. Numerous agents frequently enrolled several different consumers by submitting an image of the same program eligibility card or sometimes a fake card. In some instances, field agents retrieved and relied on online images of SNAP cards.

45.     In other instances, field agents obtained and used temporary SNAP cards because they did include the actual benefit recipient's name. Although Credico's managers received numerous reports that field agents were using the same program eligibility card repeatedly to enroll different individuals, they failed to put in place adequate and effective systems and procedures to prevent this practice for much of the relevant time period.

46.     Field agents also intentionally slightly altered the way in which a subscriber's demographic information, such a consumer's name or address, was input to avoid having the application rejected as a duplicate by the CGM platform or NLAD.

47.     Master agents and field agents were well aware of the limitations of the automated duplicate check process performed by the CGM platform and later NLAD, which typically would only flag instances where a consumer's information exactly matched the information of another previously enrolled consumer. By slightly manipulating how the individual's identifying information was input, field agents knew that they could bypass the deficient systems used by Credico to detect duplicate subscribers.

48.     Credico enrolled and claimed federal reimbursement for tens of thousands of duplicate subscribers. As would be demonstrated by the company's customer database, many different Lifeline accounts were associated with what plainly appears to be the same consumer.

49.     Credico was well aware that field agents developed ways to manipulate a consumer's data to bypass the limited automated duplicate checks in place but, as discussed further below, failed for much of the relevant time period to put in place an adequate and effective system to detect and deny Lifeline applications that were clearly for duplicate subscribers.

50.     By approving these applications, and in turn requesting and receiving federal reimbursement for duplicate subscribers, Credico and the ETCs with which it contracted failed to comply with Lifeline rules.

51.     In addition, Credico field agents tampered with identification or eligibility documentation, and intentionally transmitted blurry or partial images of the documentation, to try to conceal the fact that the information on the documentation did not match the subscriber's actual name or the other information on the Lifeline application. Credico had access to these images but still enrolled the prospective subscriber notwithstanding clear legibility issues with the proof submitted.

52.      Credico and the ETCs also sought federal reimbursement for subscribers notwithstanding clear indicia that they had not signed the required certification, as mandated by Lifeline rules. Certain field agents provided their own signature, printed their own name, or wrote a straight or curvy line where the prospective subscriber's signature was supposed to appear on the Lifeline application.

53.      Once again, Credico acted with reckless disregard to clear indications of fraud, and requested and received federal reimbursement for these accounts even though it was evident that the field agent, instead of the actual consumer, had signed the required certification. Furthermore, Credico field agents submitted false customer addresses to enroll duplicate or otherwise ineligible subscribers.

54.      Credico approved Lifeline applications even if the address listed on the application did not match the address listed on the identification proof provided. Field agents also entered false social security numbers for Lifeline applicants.

55.      The field agents who engaged in the above-referenced fraudulent conduct to generate Lifeline enrollments were acting on behalf of Credico the ETCs. Credico was ultimately responsible for reviewing the information and documentation collected and submitted with each Lifeline application, and for complying with Lifeline eligibility rules.

### V.      Credico Failed to Implement Effective Policies and Procedures to Ensure the Eligibility of Lifeline Subscribers in Violation of Lifeline Rules

56.      During much of the relevant time period, Credico failed to implement effective policies and procedures to ensure the eligibility of the Lifeline subscribers for whom Credico received federal reimbursement, as required by Lifeline regulations.

57.     In many instances, even a cursory review of the information and documentation submitted in support of a Lifeline application, or a straightforward search of the existing customer database, would have shown that the application was faulty and should be denied. However, to maximize enrollment figures and to meet its aggressive sales targets, Credico approved these applications with little or no scrutiny and requested and received millions of dollars in federal payments to which it was not entitled.

58.     Some automated platforms performed a limited electronic vetting of the information collected by the field agent at the time of enrollment, which included an address verification and a limited duplicate check process. However, Credico was ultimately responsible for manually reviewing the customer's information and documentation to verify the consumer's eligibility.

59.     The individuals assigned to review Lifeline applications—referred to as "auditors"—were supposed to confirm that the consumer had not previously enrolled with Credico, that the information on the identification and eligibility documentation was consistent, and that the prospective subscriber met Lifeline eligibility criteria.

60.     Where a review did occur, Credico auditors rarely denied the prospective subscriber's application, even though many applicants did not meet Lifeline eligibility requirements. The reviews were cursory at best and failed to detect duplicate subscribers or clear deficiencies in the submitted information and documentation that called into question the consumer's eligibility for the Lifeline program.

61.     Credico management closely tracked the rate at which Lifeline applications were denied, and wanted to minimize the number of denials. As a result, even in the limited number of instances where applications were initially denied, Credico tried to find ways to "save" these applications.

VI.   **Credico Failed to Adequately Train and Oversee Field Agents and Knowingly Allowed Certain Agents to Continue to Engage in Fraudulent Enrollment Practices**

62.   Master agents, as well as the field agents they retained, were compensated in part based on their enrollment numbers. Thus, they were incentivized to enroll as many Lifeline subscribers as possible, regardless of eligibility.

63.   Credico failed to properly vet and train its field agents, and allowed agents who it knew were engaging in fraudulent enrollment practices to continue to enroll subscribers for whom Credico and the ETCs received federal payments.

64.   For much of the relevant time period, Credico did not screen or review the credentials or backgrounds of the field agents who were tasked with performing enrollments on the company's behalf. Many of the field agents had extensive criminal histories.

65.   For much of the relevant time period, Credico's field agents frequently received little or no training and started enrolling consumers with little familiarity with Lifeline program requirements or how to verify a prospective subscriber's eligibility. Although Credico provided training to its master agents, Credico relied on the master agents to train field agents and did not ensure that such training was provided.

66.   Credico failed to put in place effective mechanisms to oversee and monitor the conduct of field agents. Credico staff rarely personally observed their field agents' conduct in the field and did not engage in monitoring practices that could have detected and prevented field agent abuses. Moreover, during much of the relevant time period, even when Credico learned that a field agent was using the same program eligibility proof repeatedly or engaging in some other type of improper

conduct, they generally allowed these field agents to continue to enroll subscribers for whom Credico and the ETCs requested and received federal payments.

67.      Credico managers were well aware that various high volume field agents were engaging in blatantly fraudulent enrollment practices, but the company continued to approve and seek reimbursement for individuals enrolled by these agents.

### VII.   Credico Knew That A Significant Number of the Lifeline Subscribers Were Ineligible for the Program, but Credico Still Continued to Submit Monthly Certified Reimbursement Requests for these Subscribers

68.      Credico and the ETCs were well aware that the processes and procedures for reviewing the eligibility of prospective Lifeline subscribers were ineffective and that they were not in compliance with the Lifeline rules, including the one-benefit-per-household requirement.

69.      However, Credico and the ETCs continued to submit monthly reimbursement requests certifying compliance with all Lifeline rules. In addition, Credico knew that it had received federal reimbursements for ineligible Lifeline subscribers, but did not consistently comply with its obligation to return these improper payments.

70.      Credico prioritized adding more subscribers and meeting their aggressive sales forecasts above the need to bring the program into compliance with FCC rules and regulations.

71.      Credico knew that the automated process used to detect duplicate subscribers was deficient, and that as a result, Credico was routinely enrolling and requesting federal reimbursement for duplicate subscribers in violation of the Lifeline rules.

## VIII.   False Claims and Certifications of Compliance

72.     During the relevant time period, Credico and the ETCs submitted hundreds of 497 Forms to USAC that listed the purported total number of qualifying low-income Lifeline subscribers served in a given SAC and the total reimbursement claimed for the month.

73.     As discussed above, FCC regulations provide that an ETC may receive reimbursement only if it certifies as part of its reimbursement request that it is in compliance with the Lifeline program rules and has obtained valid certification and re-certification forms for each of the subscribers for whom it seeks reimbursement. 47 C.F.R. § 54.407(d).

74.     In each 497 Form, Credico and the ETCs certified that it was "in compliance with all of the Lifeline program rules, and, to the extent required, have obtained valid certifications for each subscriber for whom" they sought reimbursement.

75.     The 497 Form certifications were false and fraudulent because, among other things: (a) the number of Lifeline subscribers reported included a significant number of subscribers who were not "qualifying low-income consumers" since they were duplicate subscribers or otherwise did not meet Lifeline eligibility requirements; (b) Credico had not obtained valid certifications of eligibility from each of the subscribers for whom Credico sought reimbursement; and (c) Credico was not in compliance with core Lifeline rules. USAC would not have made the monthly payments to Credico and the ETCs if it had known the certifications were false and fraudulent for these reasons.

76.     The ETCs knew that the 497 Forms sought reimbursement for individuals who did not meet Lifeline eligibility requirements, that Credico's policies and procedures for reviewing Lifeline applications, verifying consumer eligibility, and detecting duplicate subscribers were deficient, and

that Credico was not in compliance with all Lifeline program rules, including compliance with the one-benefit-per-household requirement.

77.     They also filed 555 Forms with the FCC and with USAC. The 555 Forms reflected the results of annual recertification efforts, including the number of subscribers who were de-enrolled as a result of the recertification process and non-usage. 47 C.F.R. § 54.416(b).

### FIRST CLAIM
### Violations of the False Claims Act: Presenting False Claims for Payment (31 U.S.C. § 3729(a)(1)(A))

78.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

79.     The Relator seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(A).

80.     Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims to USAC, an agent of the United States, by submitting monthly reimbursement requests and certifications (i.e., 497 Forms) pursuant to the Lifeline program.

81.     USAC was not aware of the falsity of the claims submitted, and would not have disbursed funds to Total Call under the Lifeline program if it had known that Credico's monthly reimbursement requests and certifications were false and that Credico did not comply with applicable FCC rules and regulations or its Compliance Plan.

82.     By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## SECOND CLAIM
### Violations of the False Claims Act: Use of False Statements (31 U.S.C. § 3729(a)(1)(B)).

83.     Relator incorporates by reference each of the preceding paragraphs as if fully set forth herein.

84.     The Relator seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(B).

85.     Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, and caused to be made and used, false records and statements material to false or fraudulent claims by submitting the Compliance Plan, monthly reimbursement requests and certifications (i.e., 497 Forms), and annual certifications (i.e., 555 Forms) to USAC and the FCC.

86.     USAC was not aware of the falsity of those records and statements, and would not have disbursed funds to Credico under the Lifeline program if it had known that the Compliance Plan, the monthly reimbursement requests and certifications, and the annual certifications were false and that Credico did not comply with applicable FCC rules and regulations and its Compliance Plan.

87.     By reason of these false records and statements, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## THIRD CLAIM
### Violations of the False Claims Act: Failure to Repay Government Funds (31 U.S.C. § 3729(a)(l)(G))

88.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth herein.

89.     The Relator seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(G).

90.     Through the acts set forth above, Credico violated the rules and regulations of the Lifeline

program and knowingly requested and received federal reimbursements for tens of thousands of

duplicate or otherwise ineligible subscribers. Defendants knowingly failed to repay to USAC funds

Credico improperly received for ineligible subscribers, despite its obligation to do so under

applicable FCC rules and regulations.

91. By reason of Defendants' failure repay these funds, the Government has sustained damages in

a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty

for each violation.

## FOURTH CLAIM
### Payment by Mistake of Fact

92.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth

herein.

93.     The Relator seeks relief against Defendants to recover monies paid under mistake of fact.

94.     USAC, an agent of the United States, disbursed funds to Credico pursuant to the Lifeline

program based on the mistaken and erroneous belief that Credico was acting in compliance with

FCC rules and regulations and its Compliance Plan, and that Credico was seeking payments only

for eligible Lifeline subscribers. These erroneous beliefs were material to USAC's decision to make

these payments.

95.     By reason of the foregoing, the Government has sustained damages in a substantial amount

to be determined at trial.

## FIFTH CLAIM
### Unjust Enrichment

96.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth

herein.

97.     Through the acts set forth above, Credico has received payments pursuant to the Lifeline

program to which it was not entitled and therefore was unjustly enriched. The circumstances of

these payments are such that, in equity and good conscience, Credico should not retain those

payments, the amount of which is to be determined at trial.

## DAMAGES/DEMAND FOR RELIEF

98.     As a result of the Defendants wrongful acts, Plaintiff has been damaged and has paid excess

money amounting to the difference between the represented wages and the wages actually paid by

Defendant to employees.

99.     Accordingly, Plaintiff demands judgment be entered against the Defendants for and

statutory damages be awarded in the amount of not less than $5,000 and no more than $10,000.00

for each and every incident of false certification to the Government and underpayment to relator

and to each and every employee on this job who was not paid prevailing wages plus three times

the amount of damages which the United States Government has sustained as a result thereof.

100.    Plaintiff demands statutory damages be awarded as well as reasonable attorneys' fees as

provided for by the Federal False Claims Act, and, in the alternative, under the common law for

unjust enrichment and payment under mistake of fact.

101.   Plaintiff demands a monetary judgment be entered against the Defendant for violations of

the Federal False Claims Act and, under the common law for unjust enrichment and payment under

mistake of fact, and in accordance with any other remedy available at law.

102.   Plaintiff further requests an award of all costs of this litigation and any other relief allowed

for by law or equity.

## JURY DEMAND

Plaintiff demands trial by jury of all issues triable as of right by jury.

Dated:  March 2, 2021

Respectfully submitted,

*Max L. Horowitz*

**Anthony M. Georges-Pierre, Esq.**
Florida Bar No.: 533637
agp@rgpattorneys.com
**Max L. Horowitz, Esq.**
Florida Bar No.: 118269
mhorowitz@rgpattorneys.com
**REMER & GEORGES-PIERRE, PLLC**
44 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 416-5000
Facsimile: (305) 416-5005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on <u>March 2, 2021</u>, I electronically filed the foregoing document with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via electronic transmission of Notices generated by the Florida Courts E-Filing Portal or in some other authorized manner for those counsel or parties who are not authorized to receive such Notices.

**James A. Weinkle, Esq.**
James.weinkle@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
Southern District of Florida
99 N.E. 4th Street, Third Floor
Miami, Florida 33132
Telephone: (305) 961-9290
Facsimile: (305) 530-7139
*Counsel for the United States of America*

**Sarah E. Loucks, Esq.**
Sarah.e.loucks@usdoj.gov
Trial Attorney
U.S. Department of Justice
Civil Division
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
*Counsel for the United States of Americai*

/s/ *Max L. Horowitz*
**Anthony M. Georges-Pierre, Esq.**
Florida Bar No.: 533637
agp@rgpattorneys.com
**Max L. Horowitz, Esq.**
Florida Bar No.: 118269
mhorowitz@rgpattorneys.com